UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ROCKEFELLER F. COOPER, II,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> vs. ) <br> ) <br> **JEFFERSON COUNTY,** ) <br> **ALABAMA,** ) <br> ) <br> **Defendant.** ) | Civil Action Number <br> **2:17-cv-01997-AKK** |

## MEMORANDUM OPINION AND ORDER

Dr. Rockefeller F. Cooper, II, a native of Liberia and who is proceeding *pro se*, brings this action against his former employer, Jefferson County, Alabama d/b/a the Jefferson County Coroner and Medical Examiner Officer ("JCCMEO"), asserting that JCCMEO violated Title VII of the Civil Rights Acts of 1964, 42 U.S.C. § 2000e-2, by discriminating against him on the basis of race and national origin, subjecting him to a hostile work environment, and discharging him after he complained of a hostile work environment. Doc. 6.[1] Dr. Cooper has moved for

---

[1] The introductory paragraphs of the Amended Complaint state that Dr. Cooper brings his action under both Title VII and 42 U.S.C. § 1981 and that the court has jurisdiction under both statutes. *See* doc. 6 at 2. But, the remainder of the Amended Complaint and Dr. Cooper's summary judgment briefing contend that JCCMEO violated only Title VII. *See id.*; doc. 51. Therefore, it seems Dr. Cooper is only pursuing claims under Title VII. But, even if he is in fact pursuing § 1981 claims also, the analysis of the Title VII claims applies equally to the § 1981 claims, if any, because "[b]oth of these statutes have the same requirements of proof and use the

summary judgment arguing, among other things, that the record establishes JCCMEO intentionally discriminated and retaliated against him. *See* doc. 51. JCCMEO has also moved for summary judgment, arguing that Dr. Cooper cannot establish a prima facie case of disparate treatment or retaliation and that he cannot show its reasons for discharging him are pretextual. Docs. 54; 55.[2] After careful consideration of the record and relevant law, Dr. Cooper's motion is due to be denied, and JCCMEO's motion is due to be granted. However, because JCCMEO did not address Dr. Cooper's hostile work environment claim, this claim will proceed to a jury trial.[3]

I.  STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

[2] JCCMEO purports to move for summary judgment on all of claims, contending that Dr. Cooper only asserts discrimination and retaliation claims. Docs. 54; 55 at 5. However, the Amended Complaint alleges that Dr. Cooper's supervisors "subjected [him] to being in a hostile environment and emotionally abused . . . ." Doc. 6 at 6. Although the Amended Complaint is not a model of clarity, because Dr. Cooper is proceeding *pro se*, the court must "liberally construe his pleadings," *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citation omitted), and his allegations are sufficient to give JCCMEO notice of a hostile work environment claim.

[3] JCCMEO asks the court to strike Dr. Cooper's motion and his opposition brief for failing to comply with the summary judgment briefing order. Docs. 58 at 4-6; 61. The court declines to do so because Dr. Cooper's motion for summary judgment is due to be denied on the merits and JCCMEO's motion is due to be granted on the merits.

Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally

insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

The simple fact that both parties have filed partial motions for summary judgment does not alter the ordinary standard of review. *See Chambers & Co. v. Equitable Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955) (explaining that cross-motions for summary judgment "[do] not warrant the granting of either motion if the record reflects a genuine issue of fact"). Rather, the court will consider each motion separately "'as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004)).

## II. RELEVANT FACTUAL BACKGROUND

Dr. Cooper worked as a morgue technologist for JCCMEO for four months between November 2016 and March 2017. Doc. 56-1 at 40. During that time, Dr. Cooper reported to Dr. Julianna Dufeck, and Dr. Gregory Davis served as the

4

Chief Coroner/Medical Examiner. Docs. 56-1 at 40; 56-5 at 1; 56-9 at 1. As a morgue technologist, Dr. Cooper performed anatomical dissections, collected and recorded evidence from bodies, prepared labels and procured toxicological specimens, and helped maintain the morgue facility by keeping it clean and decontaminated. Doc. 56-2 at 47.

Approximately a month after he started at JCCMEO, Dr. Cooper met with Sherry Tidwell, the Administrative Services Manager, to express concerns about communication in the morgue. Doc. 56-4 at 1. Based on that meeting, Tidwell scheduled training entitled "Conflict in the Work Place," which all JCCMEO staff attended. *Id.* at 2. In spite of the training, Dr. Cooper continued to experience issues with certain coworkers, particularly Barry Franklin, another morgue technologist. *See* docs. 51 at 54; 56-12 at 3. Dr. Cooper contends that Franklin attempted to sabotage his work by setting up contaminated collection bottles for Dr. Cooper to use during autopsies. *See* doc. 51 at 31-32.

In January 2017, Dr. Dufek spoke to Dr. Cooper about his pattern of arriving late to work. Doc. 56-9 at 8. Thereafter, during the last week of the month, Dr. Cooper was tardy four days in a row. Docs. 56-1 at 42-47; 56-9 at 8. According to Dr. Dufek, Dr. Cooper's consistent tardiness was unacceptable in part because the morgue is busiest at the beginning of each work day. Doc. 56-9 at 8. Consequently, Dr. Dufek issued a written warning to Dr. Cooper informing him

5

that his tardiness is unfair to his coworkers and that "[d]isciplinary action may be recommended for any violations in the future." Doc. 56-2 at 50; 56-9 at 9. Even so, Dr. Cooper arrived late again on two more occasions. Docs. 56-5 at 4; 56-9 at 9. Accordingly, Dr. Dufek issued a written reprimand to Dr. Cooper, warning him that future violations could result in "[d]isciplinary action up to and including dismissal . . . ." Doc. 56-2 at 51.

In February 2017, Drs. Dufek and Davis met with Dr. Cooper to discuss his three-month performance appraisal. Docs. 56-1 at 49; 56-2 at 54-57. The appraisal reflects that Dr. Cooper's job performance was below expectations with respect to two of eight criteria (compliance with rules, policies, and procedures, and performing anatomical dissections) and that his performance needed improvement on another four criteria, including communication. Doc. 56-2 at 55. Thus, based on the appraisal, Dr. Cooper's job performance met expectations with respect to only two of eight criteria, and the appraisal informed him that "[s]ignificant improvement is expected or further action will be necessary." *Id.* at 54-55. And, Dr. Cooper signed off on the appraisal to relfect that his supervisors reviewed the appraisal with him and that he agreed with it. *Id.* at 54.

Following the performance appraisal, coworkers and supervisors continued to point out to Dr. Cooper alleged issues with his job performance. For example, Dr. Daniel Dye reviewed proper procedures for dissecting a decedent's neck with

Dr. Cooper after Dr. Dye observed issues with his technique. Doc. 56-6 at 1-2, 4. Subsequently, Dr. Dan Atherton observed Dr. Cooper dissecting a decedent's neck prior to removing the decedent's brain in contravention of JCCMEO protocols, and explained to Dr. Cooper the proper technique. Doc. 56-7 at 2.

On March 13, 2017, Dr. Dufek gave Dr. Cooper a written reprimand for disregarding instructions from Dr. Brandi McCleskey, a pathology fellow, and opening a body to begin an autopsy without authorization. Doc. 51 at 45. According to Dr. McCleskey, she instructed Dr. Cooper to get dressed to prepare to perform an autopsy, but she told Dr. Cooper to wait for Dr. Atherton, the attending physician, before opening the body. Doc. 56-8 at 4. On the other hand, Dr. Cooper contends that Dr. McCleskey authorized him to begin the autopsy. Doc. 48-1 at 48. In light of Dr. Cooper's alleged failure to follow Dr. McCleskey's instructions and Dr. Cooper's prior issues communicating with coworkers, the reprimand required Dr. Cooper to attend an effective listening skills training. Doc. 56-2 at 52-53. The reprimand advised Dr. Cooper once again that "disciplinary action up to and including dismissal may be recommended for any violations in the future." *Id.* at 52.

On March 21, 2017, Dr. Atherton gave Dr. Cooper permission to begin an autopsy, and Dr. Cooper began to set up his own supplies for the autopsy even though Franklin had set up the supplies earlier that morning. Docs. 56-1 at 55-56.

7

When Dr. Dufek noticed Dr. Cooper repeating work that Franklin had already done, she instructed Dr. Cooper to use the supplies Franklin set up, but Dr. Cooper refused and told Dr. Dufek to do the autopsy herself. Docs. 56-1 at 56; 56-7 at 2. After Dr. Cooper refused Dr. Dufek's order, the two had a meeting with Dr. Davis, during which Dr. Cooper accused Franklin of harassment and trying to sabotage his work. Dr. Cooper also expressed his frustration with Dr. Dufek and Franklin, and repeatedly shouted "I am sick and tired." Docs. 56-1 at 58; 56-5 at 7.

Dr. Davis's schedule did not permit a lengthy meeting that morning. As a result, Dr. Davis informed Dr. Cooper that he would meet with him again when he returned to the office later that day. Doc. 56-5 at 8. And, in light of the heated discussion during their meeting, Dr. Davis also instructed Dr. Cooper not to enter the morgue until after he had a chance to talk with him again. Docs. 56-9 at 2; 56-5 at 8. Dr. Cooper disregarded Dr. Davis's instructions and confronted Franklin in the morgue, accusing him of harassment and telling Franklin "to keep [Dr. Cooper's] name out of his mouth." Doc. 56-1 at 59. When Dr. Davis returned to the JCCMEO office, Dr. Cooper gave him a written complaint of harassment against Franklin, stating the he "can no longer tolerate the hostile environment that is being created by [] Franklin." Doc. 51 at 58.

While Dr. Davis was out of the office that morning, he met with the county attorney and recommended serving a notice of contemplated discipline on Dr.

8

Cooper. Doc. 56-5 at 9-10. The following day, JCCMEO provided Dr. Cooper with the notice and placed him on administrative leave with pay pending a hearing. Docs. 51 at 43-44, 59; 56-3 at 98. The notice charged Dr. Cooper with violating certain personnel board rules based on his alleged failure to follow Drs. McCleskey's and Davis's instructions and JCCMEO protocol regarding organ removal. Doc. 56-3 at 98. A week after serving the notice of contemplated discipline, JCCMEO held a disciplinary hearing where Dr. Cooper presented his case and argued that JCCMEO had mistreated him. Doc. 56-5 at 10.

Following the hearing, JCCMEO discharged Dr. Cooper based on its finding that he violated personnel rules as charged in the notice of contemplated discipline. Doc. 56-2 at 61-62. In deciding to discharge Dr. Cooper, JCCMEO considered Dr. Cooper's disciplinary history, performance evaluations, reprimands and records of counseling, leave and attendance record, and the recommendation of his supervisors. Doc. 56-2 at 62. Dr. Cooper did not appeal his discharge to the Alabama State Personnel Board. He filed instead a charge with the Equal Employment Opportunity Commission alleging discrimination based on race, sex, and national origin, retaliation, and a hostile work environment. Doc. 56-2 at 58.

## III. ANALYSIS

Dr. Cooper argues that he is entitled to summary judgment because the record shows JCCMEO intentionally discriminated and retaliated against him.

9

Doc. 51.[4]  On the other hand, JCCMEO contends that Dr. Cooper did not establish a prima facie case with respect to his disparate treatment and retaliation claims, and cannot show that JCCMEO's articulated reasons for the discharge are pretextual.  Doc. 55.[5]  The court addresses the parties' contentions related Dr. Cooper's prima facie cases of discrimination and retaliation before turning to JCCMEO's proffered reasons for the discharge and the parties' contentions regarding pretext.

### A. Dr. Cooper's Prima Facie Case of Discrimination Based on Disparate Treatment

Dr. Cooper asserts race and national origin disparate treatment claims based on his contentions that JCCMEO unfairly disciplined him.  Doc. 6.  Because Dr. Cooper relies on circumstantial evidence to prove his claims, the court applies the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d

---

[4] Dr. Cooper appears to argue in his motion that JCCMEO subjected him to a hostile work environment, *see* doc. 51 at 17-18, but he does not clearly ask for summary judgment on the claim. But, Dr. Cooper's failure to seek summary judgment on the claim is not equivalent to abandoning the claim, especially in light of his *pro se* status.

[5] JCCMEO also argues in passing that Dr. Cooper's "claims for wrongful termination cannot lye [sic] and fail as a matter of law" because Jefferson County operated under a consent decree during Dr. Cooper's employment, and all employment decisions for the County "fell under the responsibility of the Court-appointed Receiver . . . ." Doc. 55 at 6-7. However, JCCMEO failed to adequately develop this argument or cite any binding authority to support it. *See id.* And, "[i]ssues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived." *Cont'l Tech. Serv., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991).

1318, 1330-31 (11th Cir. 1998). Under that familiar framework, Dr. Cooper bears the initial burden of establishing a prima facie case by showing he is a "qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside [his] protected class." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citation omitted). If he satisfies this burden, the burden shifts to JCCMEO to produce a legitimate, non-discriminatory reason for the challenged action. *Id.* If JCCMEO articulates such a reason, the burden shifts back to Dr. Cooper to prove that JCCMEO's proffered reason is pretextual. *Id*.

In its motion, JCCMEO does not dispute that Dr. Cooper is a member of a protected class, was qualified for his position as a morgue technologist, and that the written reprimands qualify as adverse employment actions. *See* doc. 55 at 22, 26-27. Thus, the parties' dispute hinges on whether JCCMEO treated Dr. Cooper less favorably than similarly-situated employees outside of his protected class. *See* docs. 51; 55 at 26-28. The Eleventh Circuit recently addressed the standard courts must apply to determine whether a plaintiff and his comparators are, in fact, similarly situated, holding that "a plaintiff must show that []he and [his] comparators are 'similarly situated in all material respects.'" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc). Courts must apply this standard "on a case-by-case basis, in the context of the individual

11

circumstances" of the case, considering, among other things, whether the plaintiff and comparators "engaged in the same basic conduct," "have been subject to the same employment policy, guideline, or rule," and share similar employment or disciplinary histories. *Id.* at 1227-28 (citations omitted).

According to Dr. Cooper, his supervisor and JCCMEO treated him differently than employees outside his protected class by discriminating against him in discipline. Doc. 51 at 7-8. *See also* doc. 6. At issue here are several verbal and written warnings Dr. Dufek issued, including a written warning based on tardiness four days in a row, which informed Dr. Cooper that "[d]isciplinary action may be recommended for any violations in the future." Doc. 56-2 at 50. When Dr. Cooper arrived late again ten days later, Dr. Dufek issued him a written reprimand. *Id.* at 51. Dr. Cooper does not dispute that he arrived late on the days in question, and admits that he has no information regarding whether any other morgue employees shared a similar history of tardiness. Doc. 56-1 at 42-47. Thus, Dr. Cooper failed to show the existence of a comparator who engaged in the same basic conduct and did not receive a warning or reprimand.

Next, Dr. Dufek reprimanded Dr. Cooper for disregarding verbal instructions and opening a body without authorization. Doc. 56-2 at 52. While Dr. Cooper disputes whether he, in fact, had permission to begin the autopsy in question, *see* docs. 51 at 8-9, 56-57; 56-1 at 48, he admits it violates JCCMEO

protocol to open a body before an attending physician examined it, doc. 56-1 at 48. Moreover, Dr. Cooper did not provide evidence indicating that Dr. Dufek did not actually believe that he failed to follow instructions on this occasion. In addition, Dr. Cooper did not identify any morgue employees who allegedly engaged in, or were accused of engaging in, similar conduct and yet were not disciplined. *See* docs. 51, 59. Accordingly, Dr. Cooper did not show the existence of similarly-situated employees outside his protected class who JCCMEO treated more favorably with respect to discipline, and his disparate treatment in discipline claims fail.[6]

### B. Dr. Cooper's Prima Facie Case of Retaliation

Dr. Cooper asserts that JCCMEO retaliated against him by placing him on leave and discharging him. Doc. 6. To prevail on these claims, Dr. Cooper must first establish a prima facie case by showing "that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quotation omitted). "The causal link element is construed broadly so that '[Dr. Cooper] merely has to prove that the protected

---

[6] The "plaintiff's failure to produce a comparator does not necessarily doom [his] case," as long as he can present a "triable issue of fact" through "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). But, in this case, Dr. Cooper has not introduced evidence of any race-based or national origin-based conduct by JCCMEO apart from his contention that JCCMEO treated his Caucasian coworkers more favorably. *See* docs. 51 and 59.

13

activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (quotation omitted). Dr. Cooper may prove this by showing close temporal proximity between his protected activity and the adverse actions. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted). If he establishes a prima facie case, the burden shifts to JCCMEO to articulate a legitimate, non-retaliatory reason for its actions. Then, as with a discrimination claim, the burden shifts back to Dr. Cooper to show the proffered reason is pretext for the JCCMEO's actual retaliatory intent. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

The parties agree that Dr. Cooper engaged in protected activity when he complained to Dr. Davis on March 21, 2017 about alleged harassment by Franklin. *See* docs. 51 at 6, 58; 56-2 at 58.[7] And, the day after this protected activity, JCCMEO placed Dr. Cooper on administrative leave with pay, and it then discharged him a week later. Docs. 51 at 43-44, 50-51, 61-62; 56-2 at 58. Despite this close temporal proximity, JCCMEO argues that Dr. Cooper cannot show a

---

[7] Dr. Cooper contends that he engaged in protected activity also on March 14, 2017, when he submitted a written opposition to the reprimand he received from Dr. Dufek for allegedly starting an autopsy without authorization. Doc. 51 at 11, 56-57. Although Dr. Cooper generally alleges in the opposition that Dr. Dufek is biased and unfair, he does not suggest that she issued the reprimand for discriminatory reasons. *Id.* at 56-57. In addition, nothing in the opposition indicates that Dr. Cooper could reasonably believe that he was challenging any action prohibited by Title VII. *See id.* As a result, his March 14, 2017 written opposition is not statutorily protected activity. *See Butler*, 536 F.3d at 1213.

14

causal link between this activity and an adverse employment action because it expressly contemplated disciplinary action against him before his protected activity. Doc. 55 at 30. However, JCCMEO did not expressly contemplate or begin the process of placing Dr. Cooper on administrative leave or discharging him prior to his protected activity. Accordingly, because the causation element is construed broadly, *Pennington*, 261 F.3d at 1266, the close temporary proximity between the protected activity and the administrative leave and discharge raises a question of fact regarding causation, and consequently the court finds that Dr. Cooper can make a prima facie case of retaliation. But, to be entitled to or survive summary judgment, Dr. Cooper still must show that JCCMEO's reasons for its actions are pretext for its actual, retaliatory purpose.

### C. Whether JCCMEO's Proffered Reasons for Dr. Cooper's Discharge are Pretextual

JCCMEO argues that the retaliation and discriminatory discharge claims fail because Dr. Cooper cannot show that its proffered reasons for its actions, i.e., his allegedly poor performance and work rule violations, are pretextual. Doc. 55 at 30-33. Dr. Cooper can show pretext "directly, by persuading the court that a discriminatory [or retaliatory] reason more likely than not motivated [JCCMEO], or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [JCCMEO's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'"

*Paschal v. United Parcel Serv.*, 573 F. App'x. 823, 825 (11th Cir. 2014) (quoting *Alvarez*, 610 F.3d at 1265). "The inquiry into pretext centers upon [JCCMEO's] beliefs, not [Dr. Cooper's] beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (citation omitted).

JCCMEO contends that it placed Dr. Cooper on leave and ultimately discharged him due to his poor work performance and his disregard for standard office procedures and rules, doc. 55 at 31, which, as Dr. Cooper admits, are legitimate reasons to discharge an employee, *see* doc. 56-1 at 21-22. Dr. Cooper contends, however, that the poor performance appraisal he received contains false allegations. This contention is unavailing because, although he asserts he "did not affix his legitimate signature to the [appraisal]" and signed it only to keep his job, doc. 59 at 11, Dr. Cooper checked a box indicating that he agreed with the appraisal and signed it even though he had an option to disagree or refuse to sign it, doc. 56-2 at 54. In addition, Dr. Cooper does not dispute that coworkers and supervisors continued to express concern about his performance even after he received the performance appraisal. *See* doc. 51. Thus, Dr. Cooper failed to show that JCCMEO's contention that it discharged him based in part on his allegedly poor job performance is implausible or unworthy of credence.

Next, although Dr. Cooper does not dispute that JCCMEO reprimanded him on several occasions for failing to follow work rules and proper protocols, he contends that the reasons for reprimanding him are false because, based on his education and training, he would not open a body without authorization or fail to follow proper protocols at work. *See* doc. 51. This contention is also unavailing because Dr. Cooper does not dispute that Dr. McCleskey states that she asked him to wait before beginning the autopsy or that Drs. Dufek and Davis believed he opened a body without authorization. *See* doc. 51 at 14-15. Dr. Cooper also does not dispute that Drs. Dye and Atherton spoke to him on different occasions regarding the proper procedure for performing a neck dissection, and has not provided evidence indicating that JCCMEO did not actually believe that he failed to perform the work according to its protocols. *See* doc. 51.

Finally, Dr. Cooper argues that the swift action following the hearing shows that the reasons for discharging him are pretextual. *See* doc. 51 at 13. Basically, Dr. Cooper believes that the hearing officer acted unfairly by failing to spend more time considering the document he submitted at the hearing. *See id.* But, the hearing officer's purportedly quick decision to recommend Dr. Cooper's discharge does not show that discriminatory or retaliatory animus motivated JCCMEO's actions. And, while Dr. Cooper may disagree with the decision to place him on leave and discharge him, "it is not [the court's] role to second-guess the wisdom of

17

an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory [or retaliatory] motive." *Alvarez*, 610 F.3d at 1266 (citation omitted).

## IV. CONCLUSION AND ORDER

Dr. Cooper has failed to show that the articulated reasons for his discharge are pretextual, and that JCCMEO treated him differently in discipline than similarly-situated comparators. Therefore, his disparate treatment, discriminatory discharge, and retaliation claims fail, and, as to these claims, JCCMEO's motion, doc. 54, is **GRANTED**. JCCMEO's motions to strike, docs. 58 and 61, are **DENIED**. And, in light of Dr. Cooper's failure to establish a prima facie case of discrimination and retaliation, or to show that JCCMEO's reasons for its actions are pretextual, Dr. Cooper's motion for summary judgment, doc. 51, is **DENIED**.

Finally, Dr. Cooper's hostile work environment claim, which was not a part of JCCMEO's motion, will proceed to a jury trial on **September 30, 2019** at **9:00 a.m.** The final pre-trial conference is **SET** for **August 20, 2019** at **10:30 a.m.** The court directs the parties to the Standard Pretrial Procedures governing all pretrial deadlines, which is attached as Exhibit A.

**DONE** the 26th day of July, 2019.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

PRE-TRIAL DOCKET
HON. ABDUL K. KALLON, PRESIDING

# BIRMINGHAM, ALABAMA

This case is set for a pre-trial hearing pursuant to Rule 16 of the Federal Rules of Civil Procedure. A conference-type hearing will be held in chambers in the Hugo Black Federal Courthouse in Birmingham, Alabama at the time indicated.

The hearing will address all matters provided in Rule 16, including the limitation of issues requiring trial, rulings on pleading motions, and settlement possibilities.

Counsel attending the conference are expected to be well-informed about the factual and legal issues of the case, and to have authority to enter appropriate stipulations and participate in settlement discussions. <u>Counsel appearing at the conference will be required to proceed at trial notwithstanding the naming of others as designated trial counsel</u>.

Promptly upon receipt of this notice, plaintiff's counsel is to initiate discussions with other counsel aimed at ascertaining which basic facts are not in dispute, at clarifying the parties' contentions (for example, just what is denied under a "general denial") and at negotiating workable procedures and deadlines for remaining discovery matters. <u>At least four (4) business days in advance of the conference, plaintiff's counsel is to submit to chambers (via email at kallon_chambers@alnd.uscourts.gov) a proposed Pre-trial Order in Word or WordPerfect format</u>, furnishing other counsel with a copy. It is anticipated that in most cases the proposed order, with only minor insertions and changes, could be adopted by the court and signed at the close of the hearing.

A sample of a proposed Pre-trial Order is available on the Chamber web site (http://www.alnd.uscourts.gov/content/judge-abdul-k-kallon) to illustrate the format preferred by the court and also to provide additional guidance and

instructions.  Each order must, of course, be tailored to fit the circumstances of the individual case.

Counsel drafting this proposed order should consider the utility this document will provide for the litigants, the jury, and the court alike.  The court anticipates using the pretrial order to (1) identify and narrow the legal and factual issues remaining for trial, and (2) provide jurors with the legal and factual context of the dispute.  This order should **not** revisit at length arguments made in previous filings with the court, nor should it serve as another venue for adversarial posturing.  Pretrial orders should be simple, short, and informative.

IN ANY CASE WHERE COUNSEL HAVE ANNOUNCED SETTLEMENT TO THE COURT, A CONSENT JUDGMENT IN SATISFACTORY FORM <u>MUST</u> BE PRESENTED TO THE COURT <u>PRIOR</u> TO THE SCHEDULED TRIAL DATE; OTHERWISE, THE CASE WILL BE DISMISSED <u>WITH</u> PREJUDICE.